UNITED STATES DISTRICT COURT
EASTERN COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

MIRIAM ABER,

Plaintiff,

- against - Docket No. 09-CV-490 (ILG/RLM)

AMERICAN SECURITY INSURANCE COMPANY,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

August 27, 2009
10:09 a.m.

Deposition of BERNARD SANTANGELO, taken by Plaintiff, pursuant to subpoena, at the offices of Abraham, Lerner, and Arnold, 292 Madison Avenue, 22nd Floor, New York before TONIANN MCCULLOUGH, a Professional Court Reporter and Notary Public within and for the State of New York.

CONDENSED

APPEARANCES:

ABRAHAM, LERNER, AND ARNOLD
Attorneys for Plaintiff
292 Madison Avenue
New York, New York 10017
BY: JOHNATHAN LERNER, ESQUIRE

LAVIN, O'NEIL, RICCI, CEDRONE & DiSPIRIO
Attorneys for Defendant
420 Lexington Avenue, Suite 2900
New York, New York 10170

BY: FRANCIS F. QUINN, ESQUIRE



IT IS HEREBY STIPULATED, by and between the respective parties hereto, that:

All rights provided by the C.P.L.R., and Part 221 of the Uniform Rules for the Conduct of Depositions, including the right to object to any question, except as to form, or to move to strike any testimony at this examination is reserved; and in addition, the failure to object to any question or to move to strike any testimony at this examination shall not be a bar or waiver to make such motion at, and is reserved to the trial of this action.

This deposition may be sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this examination was begun, but the failure to do so or to return the original of this deposition to counsel, shall not be deemed a waiver of the rights provided by Rule 3116 of the C.P.L.R., and shall be controlled thereby.

The filing of the original of this deposition is waived.



BERNARD SANTANGELO, after having been duly sworn, was examined and testified as follows:

EXAMINATION BY MR. LERNER:

Q. State your name for the record, please.

A. Bernard Santangelo.

Q. What is your current business address?

A. 5600 First Avenue, Brooklyn, New York.

Q. Good morning, Fire Marshal Santangelo. My name is Johnathan Lerner. I'm an attorney with the law firm of Abraham, Lerner, and Arnold, and we represent Miriam Aber in connection with a lawsuit that she has commenced against the American Security Insurance Company for damages sustained to the premises located at 1037 - 42nd Street, Brooklyn, New York as a result of a fire that took place back on November 6th of 2006.

I'm going to be asking you some questions today about your involvement, if any, in connection with the investigation by the New York City Fire Department with respect to this particular fire.

And are you appearing here today pursuant to a subpoena?

A. Yes.

(Document marked Santangelo-1 for identification.)



B. Santangelo

BY MR. LERNER:

Q. I'm going to show you a copy of what I've marked as Santangelo Exhibit-1 for identification and I'll just ask you to take a look at that, please.

A. Yes, that is what I received.

Q. Is the document that I put in front of you as Santangelo Exhibit-1 the subpoena that was served upon you?

A. Yes.

Q. Is that the document pursuant to which you are appearing here today for your deposition?

A. Yes.

Q. And I understand that the original date was last Wednesday, so we rescheduled your deposition for today, correct?

A. That's correct.

Q. As part of the subpoena that was served, it did request that you produce documents, a copy of your file with respect to the investigation, if any, that you conducted. Did you bring any documents with you today?

A. I brought the documents that were mentioned in the subpoena and I know I faxed it to you but I made them send me with it to deliver it.

Q. And this would be a fire incident report from

B. Santangelo

the Bureau of Fire Investigation in connection with the fire at the 1037 - 42nd Street premises?
A. In 2006, yes.
Q. And do you have any other documents with you today in connection with this investigation?
A. No, this is it.
MR. LERNER: We are going to go ahead and mark this document as Santangelo-2
(Document marked Santangelo-2 for identification.)
BY MR. LERNER:
Q. I'm going to hand you a copy of the document we have marked as Santangelo-2 so that we can have you identify it. Have you had the opportunity to review this document?
A. Yes.
Q. And do you recognize what has been marked as Santangelo-2?
A. Santangelo-2 is the copy of the fire report pertaining to 1037 - 42nd Street, November 6, 2006. It is a certified report.
Q. Is that report a report that is prepared specifically by the Bureau of Fire Investigations?
A. That's correct.



B. Santangelo

Q. And in addition to the report that in this particular situation was prepared by the Bureau of Fire Investigations, will a fire to a premises within the City of New York also result in the creation or generation of additional reports from the fire department?
A. I don't understand what you are driving at.
Q. Is this the only report that would be created when there is a fire to a premises located within the City of New York?
A. No.
Q. Are there other reports that are sometimes generated as well?
A. Yes.
Q. And what other reports do we see on fire losses or fires to premises in New York City other than the report that we have marked as Santangelo-2?
A. There would be a fire report that is put out -- this is the fire marshal's report -- there is a fire report that indicates what the fire companies actually did at the scene.
Q. That would be an incident report?
A. Yes. It could be an incident report. The name just...



B. Santangelo

MR. LERNER: Let's mark this as Santangelo-3.
(Document marked Santangelo-3 for identification.)
Q. Fire Marshal Santangelo, I'm going to hand you a copy of what I've marked as Santangelo-3 for identification and I'll ask you to take a look at that, please.
Okay. Have you had the opportunity to review what has been marked as Santangelo-3 for identification?
A. Yes.
Q. Do you recognize that document?
A. Yes.
Q. What is Santangelo-3?
A. It is a report, an incident report, referring to 1037 - 42nd Street. And it indicates what the fire companies did at the scene.
Q. And would that be the report that you had referenced in your earlier testimony that would set forth the activities of the responding fire fighters?
A. Yes.
Q. In addition to an incident report and a fire marshal's report, are there any other reports that would be generated by the fire department in connection with a fire?



B. Santangelo

A. I'm not sure because I usually don't get involved in that end. But this seems to be the two reports that we would get.
Q. Does the battalion chief ever prepare his own report?
A. That I believe would be on here.
Q. As part of the incident report?
A. Yes.
Q. Am I also correct that the report that we marked as Santangelo-2 is the only report that will be created in the event that an investigation of a fire is handled by the Bureau of Fire Marshals?
A. That's correct.
Q. In this particular instance, the fact that we have such a report would lead us to the conclusion that there was a fire marshal investigation into this particular fire.
A. Yes.
Q. Before we get into that report and your involvement, I just want to, if I may. Go through your background with you. Are you currently employed by the New York City Fire Department?
A. Yes.
Q. And for how long have you been employed by

B. Santangelo

the fire department?

A. Thirty-two years.

Q. And what is your current position?

A. I'm a supervising fire marshal.

Q. And for how long have you held that title?

A. Since 2002.

Q. And briefly can you just describe for me duties and responsibilities as a Supervising Fire Marshal for the City of New York?

A. At the present time I'm the executive officer of City Wide South, City Wide Command South, which is located in Brooklyn. And I work administratively. Pretty much when a commanding officer is not there, then I have the helms. Right now, I handle the supervisors. I handle, you know, any problems that come up with them being included in certain investigations if the commanding officer is not there.

Q. So am I correct that your only current investigatory role would be in the event of the absence of another supervising fire marshal?

A. No. If a case becomes a big case we will be included in it because I've handled major cases before with the U.S. government. They will sometimes run them with me and I will just advise them.



B. Santangelo

Q. And you indicated those would only be in connection with big cases?

A. You know, cases that anybody had a question on, long-term cases.

Q. And when you say you're the executive officer for City Wide Command South, what geographic part of the City does that cover?

A. We cover Brooklyn, Staten Island, Lower Manhattan from 110th Street down.

Q. And for how long have you held the executive officer title?

A. 2005.

Q. Okay. So prior to the fire that brings us here today, correct?

A. Yes.

Q. And before you were promoted to the role of supervising fire marshal in 2002, what was your title at the fire department?

A. It was a fire marshal.

Q. And for how long did you serve as a fire marshal?

A. From 1986 to 2002.

Q. And generally, again, if you could, could you just tell me what your duties and responsibilities were



B. Santangelo

as a fire marshal for the New York City Fire Department?

A. To investigate the origin and cause of fires.

Q. And as fire marshal for the City of New York, did you work within any particular geographical location?

A. The ones previously mentioned.

Q. So am I correct then that since your investigation -- withdrawn.

Am I correct then that since you have been in the roll of fire marshal and the continuing role of supervising fire marshal your area of investigation has included Brooklyn, Staten Island, and Lower Manhattan?

A. Except from 1997 to 2005.

Q. And what was the exception within that time period?

A. I was assigned to the New York City Joint Arson Task Force which was with Alcohol, Tobacco, and Firearms. I was detailed to that for five years or so.

Q. Was that a full-time detail?

A. Full-time detail.

Q. So while in the position of executive officer I would say from 2002 to 2005, your actual detail during that time period was with the New York City Joint Arson Task Force?



B. Santangelo

A. From 1997 I was a fire marshal. I worked with Alcohol, Tobacco, and Firearms till 2005. In 2002, I was still there, I was promoted to supervisor but I was involved in the Williamsburg case. Therefore, I wasn't back in a Brooklyn until 2005 and at that time I was made the executive officer.

Q. So even though during the time period 1997 to 2005 you were employed by the fire department, your actual detail was with the New York City Arson Task Force?

A. That's correct.

Q. And that was together with the ATA, you said?

A. No. It was with Alcohol, Tobacco, and Firearms. NYPD Arson and Explosion and I was deputized a United States Marshal.

Q. And when did that take place?

A. In '97. I'm still deputized today.

Q. Prior to becoming a fire marshal in 1986, what was your role in the fire department?

A. Prior to '86, I was a firefighter.

Q. For how long did you serve as a firefighter?

A. From 1977 to 1986, nine years.

Q. And what was your rank in or about 1986 when you left your role as a firefighter to become a fire

B. Santangelo

marshal?
A. I was a firefighter and I took a civil service exam and I was promoted in '86 to fire marshal.
Q. And prior to going to work for the department in 1977, were you employed?
A. Yes.
Q. And what was your employment?
A. United Airlines.
Q. What did you do for Untied Airlines?
A. I was a cargo handler.
Q. For how long?
A. 1969, February.
Q. Can you tell me a little about your educational background? What is the highest level of education you completed?
A. I have an associate's degree but I have other credits, not towards a bachelor's but I have over 196 credits in schooling that I went through.
Q. I'm assuming that most of that or at least some of it relates to your work in the investigative field of fire?
A. That's correct.
Q. We will get to that in a couple of minutes. Where is your associate's degree from?



B. Santangelo

A. Kingsborough Community College.
Q. And what year did you obtain that?
A. That was way back. I'm going to say 1975, and it's only an approximate date.
Q. That's fine. Since you brought it up a little while ago, do you have specialized training in the area of cause and origin investigation?
A. As a fire marshal everyone does.
Q. Can you give, me a brief background of your training in the investigation of cause and origin of fires?
A. After promotion the fire marshal goes through when I did it I think it was thirteen weeks of specialized training and then you work a year with a seasoned fire marshal.
Q. Is the thirteen weeks a course that would be given at the fire marshal academy in Montauk Falls?
A. No.
Q. Where was the training for that thirteen-week period?
A. When I did it, it was at the fire academy.
Q. Where is that located?
A. Randall's Island.
Q. Have you ever taken any course work or any of



B. Santangelo

the programs that they run out of the Montauk Falls Academy?
A. No.
Q. Have you ever taught at the Montauk Falls Academy?
A. No. I taught in our academy.
Q. So there was a thirteen-week training program and then one year basically as an apprentice with a supervising fire marshal?
A. No. With a seasoned fire marshal.
Q. Any additional training after that?
A. I had a lot of schooling after that.
Q. Through the fire department? Through internal?
A. Fire police.
Q. FBI?
A. Not FBI, but ATF.
Q. And with respect to the teaching that you've done, can you just give me a little general background as to the courses that you have taught in the area of cause and origin investigations?
A. Well, I taught at the fire department -- not fire academy, but our training, which is located now at Hooper Street in Brooklyn, but I taught a couple of



B. Santangelo

classes on proper rest procedures, gave them classes on the federal system because that's what I have been working on, the federal system.
Q. Over the course of your years as a fire marshal, approximately how many fires were you responsible for the investigation of?
A. I just have to say I really don't remember. That almost sounds like when I get qualified as an expert in court. I just loss track after all these years. I am afraid to say a number because when I got on it was very, very busy at that time.
Q. The Bronx was burning.
A. I never did the Bronx. It was -- I really couldn't remember a number that's how far back it's been.
Q. Was it over a thousand?
A. I would say it is but I couldn't give you an accurate number.
Q. And do you currently hold any certifications in the field of fire investigation cause and origin?
A. I'm a fire investigator 1 and 2.
Q. If you can tell me, what does that mean?
A. Well, I'm a New York State Certified Fire Investigator and what you do is you obtain that by the

B. Santangelo

time and job, the amount of fires that you investigate and the state certifies you.
Q. So there is no specific course that you need to obtain that certification, it was just straight from the number of fires you investigated?
A. Pretty much so, yes, because I was already trained as a fire marshal.
Q. Are you familiar when the NFPA 921 manual?
A. I know it, yes.
Q. And do you find the NFPA 921 manual to be authoritative?
A. No. The 921 manual is only a reference manual to us such as other reference manual books. I do not even use it.
Q. Do you ever have occasion to refer to the NFPA921 manual?
A. I usually refer to KIRK at the time, not 921.
Q. Are you a member of any professional societies?
A. I was a member of the International Society of Arson Investigators.
Q. From what period of time to what period of time?
A. I think I quit last year. After 30 years, I



B. Santangelo

said that's it.
Q. Any other societies?
A. I belong to the New York State Chapter of the International Association of Arson Investigators.
Q. And that is still present, currently?
A. Yes. It's Nassau to Brooklyn. I think it's Chapter 25.
Q. Have you ever been qualified to testify as an expert in a court of law?
A. Oh, yes.
Q. And can you just me give me an idea of approximately how many times you have been qualified?
A. I'm going to under number it. I believe it was two in the state, and the last case was federal where I was accepted as an expert witness.
Q. So three cases all together.
A. Yes, I believe three.
Q. And the state court cases, were those both in Brooklyn?
A. Yes. The other was Eastern District, a federal case.
Q. And how recently was that?
A. That was the most recent. That ended in two thousand -- 2005 is when it ended.



B. Santangelo

Q. And what was the nature of that particular action, the one in federal court?
A. The case was United States versus Nat Schlesinger.
MR. LERNER: Off the record.
(Off the record.)
BY MR. LERNER:
Q. Fire Marshal Santangelo, I'd like to talk to you a little bit about the fire that brings us here today. Understanding your role in the fire department and understanding your background a little bit, am I correct that you were not the investigating fire marshal to the fire to the 1037 - 42nd Street, Brooklyn, New York premises back on November 6th of 2006?
A. That is correct, I was not.
Q. And who was the investigating fire marshal?
A. Michael Farrel, F-a-r-r-e-l.
Q. And are you familiar with Fire Marshal Farrel?
A. Yes.
Q. And is this Fire Marshal Farrel one of the fire marshals that you currently supervise?
A. No.
Q. Back in November of 2006 was Fire Marshal



B. Santangelo

Farrel one of the fire marshals that you were supervising?
A. No.
Q. Have you ever had any supervisory responsibility over Fire Marshal Michael Farrel?
A. Yes, I made a mistake. He was in my squad for a while.
Q. And when was that?
A. It had to be about 2005 because it was about six months I was in the field before I went upstairs.
Q. But at the time of this fire, am I correct you were not his supervisor?
A. No. No.
Q. Did you have any involvement in the investigation of the November 6, 2006 fire to the 1037 - 42nd Street premises?
A. At that time?
Q. At any time.
A. No, to that time. But I was asked to look into fires, I think it was the end of last year.
Q. Have you, yourself, ever been to the 1037 - 42nd Street premises?
A. Yes.
Q. And when was the first time that you went?

B. Santangelo

A. I believe it to be in December of '08.
Q. And can you just describe to me what the premises looked like when you observed them in December of 2008?
A. They were -- they were -- they were -- well, in 2008, there was another fire.
Q. I understand.
A. So it was like semi-boarded, falling. There were two buildings next to each other.
Q. Was 1037 attached to another building?
A. No, they were individual buildings separate. I think I have some photos.
Q. The second fire that you just referenced previously to the 1037 - 42nd Street premises, do you know what the date of that fire was?
A. Off the top of my head -- oh, yeah. Hold it. Hold it -- it was November of '08.
Q. November of '08?
A. Yes. November 26th of '08.
Q. And am I correct that you had not been not in the 1037 premises at any time after the initial fire of '06 and before the second fire of '08?
A. That is correct, I had never been there.
Q. And am I correct that you were unfamiliar



B. Santangelo

with what the condition of the house would have been, let's say on November 25, 2008, the day before the fire?
A. Only what I heard. Hearsay.
Q. Well, tell me what you had heard about the condition of the 1037 - 42nd Street premises prior to the November 26, 2008 fire?
A. Well, if I read this fire, and what got us there interviewing the people over there and reading the fire that just occurred in 2008, it seems that this building was opened, vacant, squatters, not secured and it seems that both buildings were that way.
Q. When you say both buildings, you were referring to --
A. There was a building next to it.
Q. One of your pictures is 1039?
A. One is 1039, one is 1038, yes.
Q. You mean 1037?
A. I mean 1037, yes. Now, in this thing it says that the -- I'm reading from the incident report marked Exhibit-2 -- the fire originated on the third floor front room; combustible material, rubbish, fire extended to walls, floor, ceiling, entire third floor, extended through the roof, extended to the ceiling rafters of the second floor. Which is what we can see above here.



B. Santangelo

MR. LERNER: I think we are just going to mark these if we can.
(Document marked Santangelo-3 for identification.)
(Document marked Santangelo-4 for identification.)
BY MR. LERNER:
Q. Let me just show you what we've marked as Santangelo-4 and 5 for identification. With respect to Santangelo-4, I understand this to be a photograph of the premises at 1037 - 42nd Street that you would have taken after the November 2008 fire; is that correct?
A. That's correct. Unofficial.
Q. I understand. And with respect to Santangelo-5, I understand this to be a photograph that you would have taken of the neighboring premises at 1039 - 42nd Street in Brooklyn after a fire to those premises, and again this photo would be unofficial, as well, correct?
A. They were all taken the same day. Yes.
Q. The fire to the 1049 - 42nd Street premises; do you know when that happened?
A. I would have to look. February 26th of '08.
Q. And did you undertake any investigation



B. Santangelo

yourself of the February 26th fire to the 1039 - 42nd Street premises?
A. No.
Q. Do you know who the investigating fire marshal was for that fire?
A. Fire Marshal Richard Stevens, who is no longer there.
Q. And since we are on the topic of fire marshals, who would have been the investigating fire marshal for the November 26, 2008 fire to the 1037 - 42nd Street premises?
A. Fire Marshal John Orlando. And just to make your reference easy, Job No. 31584 of '08 is the number for 1037 - 42nd Street.
Q. Getting back to the November 06, 2006, fire.
A. Okay.
Q. Am I correct that you did not perform a cause and origin investigation with respect to this fire?
A. That's correct, yes.
Q. And am I correct that you would not have spoken to any of the witnesses who may have observed the fire on that date?
A. No.
Q. No? Am I not correct or I am correct?

Page 26

B. Santangelo

A. No, you're correct, the 2006. I'm sorry.

Q. Am I correct that you did not reach, yourself, any conclusions as to the cause of this fire?

A. No.

Q. And that would be true of the origin as well, correct?

A. That's correct.

Q. And have you reviewed the report that was prepared by Fire Marshal Farrel in connection with that fire?

A. Yes.

Q. And what was the current status of the investigation of the November 6, 2006 fire?

A. At the present time, it is marked closed.

Q. And I believe if I read the report correctly before that the file had been marked closed since sometime in February of 2007?

A. Yes.

Q. And with respect to the investigation, do you know what Fire Marshal Farrel concluded what the cause of fire was?

A. It was an incendiary fire.

Q. And just for the purpose of the record what is an incendiary fire?

Page 27

B. Santangelo

A. It's a fire that was caused by someone other than accidental. It's an intentionally started fire.

Q. And did Fire Marshal Farrel during the course of his investigation ever come to a conclusion as to who was responsible for starting this fire?

A. No.

Q. Do you know if Fire Marshal Farrel ever spoke to any witnesses during the course of his investigation of this fire?

A. As I look at the report, yes.

Q. And when you investigate a fire, is it custom and practice as a fire marshal to try to determine who the first responding firefighter was to the fire?

A. You usually like to talk to the first responding units. The reason for that is because they are the ones who see where the fire started so you can gain a lot of information rather than just walking and wandering around in the building trying to figure out what happened.

Q. So it's important to try to speak with the fire fighters who had been there first to get information as to what they observed upon their arrival at the scene?

A. Yes.

Page 28

B. Santangelo

Q. And one of the reasons that it is important is because you want to know where they observed this fire coming from, correct?

A. Yes.

Q. And you want to know if they saw anything that would help them conclude how the fire started?

A. No. All we want them to do is, where did you fight the fire because a lot of times we get back to the building, the building will be totally destroyed.

Now, sometimes the first two units will arrive, the fire may have only been in this room and then got out of this room and went elsewhere because of the different factors of burning, etc. And so, therefore, what I will ask you as the officer is where did you see the fires? Well, when we got in it was in a teapot. Well, great. Now I know I have to look around there instead of looking through the whole building.

Q. And that's because as the fire grows and expands and it gets oxygenated, it can reach other parts of the house, which may not necessarily be where it started, correct?

A. Correct. For every minute that fire goes, it just keeps picking up momentum.

Q. Am I correct that the fire itself can

Page 29

B. Santangelo

oftentimes destroy evidence of what may have caused it?

A. Yes.

Q. And is that another reason why you want to get an idea of where it may have started, so you can at least understand where the origin point may be and then work towards what may have been in that area to the extent some evidence may not be available?

A. Right. But then the fire would be marked either under investigation for a short period of time, undetermined, not fully ascertained, and by law we have to eliminate all accidental causes first. So if we can't eliminate the accidental, we are not going to go in incendiary.

Q. I didn't want to go through all the causes with you. I just wanted to ask some questions.

A. I just want to explain it so that it is not left hanging in the air.

Q. I appreciate that. In addition to wanting to know where the fire started from the responding fire fighters, the first responding fire fighters, do you also want to try learn from them what the condition of the premises is upon their arrival regarding whether or not it was secured?

A. Oh, of course.

B. Santangelo

Q. And why is that important?

A. If the building is locked up, you know we go -- we know that whatever caused it happened inside the building. If it happened in there -- if it was a private home and it has been locked up, well, chances are it very well could be an accident, unless the owner did it, locked the door and left, which occurs. So that was very important.

Q. And what about information about the premises not being secured? What might that tell an investigating fire marshal?

A. It would tell me a few things. I personally would take into consideration is this a vacant building, okay, if it's a vacant building, open and accessible, you know there could be squatters in there. Now, if the building is owned by someone, again remembering correctly -- and I know because we have a building, but insurance law tells me that I have to have this building sealed up and not have squatters, so if I have a vacant building, plus the insurance on a vacant building is much higher then one with a tenant in there, at least a legal tenant.

Q. With respect to the investigation that was conducted here by Fire Marshal Farrel, is it your



B. Santangelo

understanding that when he spoke with the responding firefighter, I believe it was Lieutenant Farinacci -- that Lieutenant Farinacci advised him that upon arrival he observed homeless people leaving the premises?

MR. QUINN: Objection to the form.

BY MR. LERNER:

Q. You can answer.

A. I'm going to look at it again and read it because that would be the only way that I know what happened here and that's the only thing I can tell you at the time that he did this, what was actually said.

There was a heavy fire condition on the second floor upon his arrival on the scene. Stated that there was some homeless persons leaving the building upon his arrival. He wanted to stop them but he was too busy with his firefighting duties. He had no further information on the fire.

Q. And do you know whether or not Fire Marshal Farrel was able to confirm that homeless people had been squatting or living at the premises prior to the fire?

A. Again, on the fire report there is a Mrs. Gonzalez that lives -- it doesn't have where she lives but I know that --

Q. I think she is at 1035 42nd Street.



B. Santangelo

A. All right, 1035.

It's been vacant for a long time. Homeless persons have been staying in the building. Ms. Gonzalez further stated that there are several other homes on the block that are vacant and she is afraid they will set on fire also.

Q. All right. And once Fire Marshal Farrel concluded that the fire was incendiary, was there anything else that he needed to do in connection with his investigation of this fire?

A. I don't know what he did. All I can go by is what I have here. What I personally would do from being involved in this case would be probably a lot more.

Q. I will ask it a little differently then. Once he determined it was an incendiary based on the protocol for investigations by fire marshals was he required to do anything else in connection with his investigation of this fire?

A. Required, no.

Q. Is one of the roles of a fire marshal in addition to determining cause and origin to try to determine or develop evidence as to who may have been responsible for actually setting the fire?

A. Yes.



B. Santangelo

Q. And in this particular incidence, do you know if Fire Marshal Farrel did that?

A. No.

Q. The fact that the case was marked closed as of February 2007, is that an indication that Fire Marshal Farrel was not able to develop any information or evidence as to a potential suspect for this fire?

A. The case is closed -- recommending that this case be marked closed pending further information.

Q. Okay.

A. What happens is that, especially in that time, there are a lot of jobs out there and there has to be -- you sort of set up a priority. And in this particular case, the first thing vacant, homeless people living in there, okay, that moves down the food chain. Nobody hurt, no firemen hurt, nobody injured, okay that is going to move down the food chain. It has to.

Q. During the course of your experience as a New York City fire marshal have you investigated fires in buildings were homeless people have been squatting?

A. Yes.

Q. And is it your experience that in the winter months homeless people will try to set fires to try to keep themselves warm?

B. Santangelo

A. Yes.

Q. And in Fire Marshal Farrel's report he notes that, I believe, the electric to the house had been turned off, correct?

A. Yes.

Q. And have you, during the course of your experience as an investigating fire marshal, concluded with respect to any of the investigations that you handled that an incendiary fire had been set by homeless people that had been squatting in the residence?

A. Well, that's where we differ, okay, because again, the way I would have run this investigation is the way I run everything. I would have checked to see if this house was insured. If this house was insured, then it would be a whole different ball game.

Q. What would have made it different to you if you had known the house was insured?

A. Because I do what I ended up doing in 2008, running a search on the landlord.

Q. Meaning the owner?

A. The owner.

Q. And with respect to -- we'll get to that in a couple of minutes. I'm just trying to understand -- if I could just back up -- and I don't know if you answered



B. Santangelo

my question. With respect to your investigations as an investigating fire marshal, did you ever come to a conclusion during any of your investigations that a fire had been set by squatters who were illegally living in a residence?

A. Yes.

Q. Now, the issue that you talked about looking into the insurance that goes to whether or not somebody had a potential motive to start a fire, correct?

A. Well, that is part of the investigation.

Q. Is it your testimony that if an investigating fire marshal does not investigate that component of a fire, then he has not done what is needed to be done to conclude his investigation of a fire?

A. No. Just so we understand because I think we went off a little bit, my experience is way different than anybody else. I know what I would have done on that particular case. There are certain things you do which I don't know if Mike did. I don't have his notes. I didn't even speak to him about this. I don't know if he did that so therefore I can't really answer. You have to ask him for that. And what he may do and what I may do, we are two different people.

The other thing was the other question you asked



B. Santangelo

me about, me finding homeless people in a vacant building. I'm going to say yes, as I did, and I'm also going to say in one particular incident a firefighter was killed and we found who that person was and he was arrested, not by me, but he was arrested. So if it's vacant it's not that we don't stop looking, it's just that we have to prioritize and do what we have to do first. That's what changes it. If someone is hurt, then you look at homeless.

Q. I appreciate that. So you indicated at the end of 2008 you somehow became involved in the investigation of this and some other fires. Can you just describe for me what the circumstances were surrounding your involvement with the investigation?

A. Yes. It was as I said before, I'm the executive officer. The commanding officer was notified by, I believe the chief fire marshal that somebody was making a complaint to the mayor's office, who I believe to be the people who live in 35, Gonzalez was making a complaint to the mayor's office, and the mayor's office naturally makes everybody go down and start looking at things. He went to a couple of meetings. It was on one occasion that he was not there that they sent me down to go speak to this women because she just kept making



B. Santangelo

remarks and they didn't want the fire department to have a bad name.

Q. Who was the woman? Was it Ms. Gonzalez?

A. There was a couple of them that lived in that house. Gonzalez was one of them, Valerie Gray was another -- and I got Valerie Gray living at 1029 - 42nd Street. They ended up living all in the same house. I don't know why. And her husband Richard Gray -- I believe she is an activist in the community and that's what started it all.

Q. So after you had this meeting that arose out of a complaint made to the mayor's office what investigation did you do in connection with the earlier November 2006 fire?

A. Well, I went to the scene. I said I can't do anything without knowing what I'm talking about. I went to the scene -- that's where these beautiful photographs came from -- and I spoke so her and my theory was to just, yes, the fire department is here, tell me what you want us to do, etc., etc.

And I went back and then I did a curiosity trip.

Q. Was that at another date or another time?

A. I would say during the course of a few days.

Q. And during the course of your visit to the

B. Santangelo

scene, did you ever go inside the 1037 premises?
A. I was there one day when I spoke to that lady and took these photographs. I never went back to the scene again.
Q. When you went on the day that you spoke with Ms. Gray and Ms. Gonzalez did you go inside the premises?
A. No.
Q. Well, let's talk a little bit about your curiosity trip. What was that all about?
A. I just sprung into old mode. What that was, let me see, let me see what we got here? Does somebody own this building? And who owns this building? And what else do they own? Had there been any other fires? It just kept going on like that and then I -- which come up with the other pictures and find out these two beautiful buildings were erected after two other buildings that there was a fire in are now these buildings.
Q. All right. Let me just ask you this question, when you started on your curiosity trip, did you find out who the owner was for the 1037 - 42nd Street premises?
A. Yes.



B. Santangelo

Q. And who were the owners?
A. It's under - I'm sorry if I don't pronounce it right -- but it's Nachum Aber.
Q. And what investigation, if any, did do you do of Nachum Aber, once you found out who the owner or once you believe you found out who the owner was? What investigation did you do regarding Mr. Aber?
A. Well, as I said, all I did was a cursory just to see what buildings he owned and if there were any fires in these buildings and who -- you know, what else he owned on the block actually. In other words, it wasn't an official investigation, it was to give me a better picture of what was going on.
Q. What else did you find out?
A. That they are the most unlucky people in the world.
Q. Why do you say that?
A. Because it seems the four or five buildings they own had fires in then.
Q. When you say they owned who are you referring to?
A. I'm referring to Aber.
Q. And do you know the addresses of those other buildings that they owned that had the fires?



B. Santangelo

A. We have 1037, 1039, 1037 again, we have 1021, 1025, and 1230. The years all vary.
Q. 1230. What is the street for 1230? Is that also 42nd?
A. 42nd.
Q. And what were the dates of the different fires that you just referenced?
A. 1037, as we discussed before was in '08.
MR. QUINN: And '06.
THE WITNESS: 1039 was in '08.
BY MR. LERNER:
Q. I believe you said it was in February of '08, correct?
A. 1039 was February 26th of '08. 1037 we discussed. 1021 was in '04.
Q. Do you have the date of that?
A. That was May 31st of '04.
Q. 1025?
A. 1025 had a fire a month later. June 5th of '04.
Now, 1230 - 42nd Street had a fire December 30th of '03, but I must admit the first name was E-l-i-n-e-l-e-c-h Aber.
Q. E-l-i-n-e-l-i-c-h?



B. Santangelo

A. -e-l-e-c-h, Aber. And they have it like that's the last name and Aber is the first. It's probably just a mix up.
Q. And what about for the two 1037 consecutive fires, are those both identified Nachum?
A. Mirim Aber.
Q. For which one?
A. 1037. All right. 11/26/08, it's Mirim.
Q. I believe the 11/6/06 we identified previously they had as Nachum.
A. Mirim is February 26th of '08, which is 1039, and my buddy Nachum is 1037 -- all right, is November of '06; May 31st of '04 was Nachum, and they just got his last name spelled as A-m-b-e-r; June 5th of '04 was Nachum.
Q. How did they spell his last name on that one?
A. A-b-e-r. And as I said, 12/3/03 was that big one.
Q. Did you ever seek to question Mr. Nachum Aber?
A. Yes.
Q. And how did you go about doing that?
A. That same day, they told me he lived at a different address and I said let me just go take a shot

B. Santangelo

maybe there is a simple thing to this. And I went -- I don't even remember the address but I bounced around addresses. I found out he has numerous construction companies and I believe I ended at I'm going to say 1172 or 1174 -- and I don't know if it was 41st or 42nd Street to be honest with you.

Somebody told me that -- I rang the basement. They didn't answer. I rang again. A male and a female, Hasidic person, and I asked him about him, and he said, I believe he said it's my brother-in-law and I left my card and I said can you have him call me. And that's the extent of it.

Q. And did you ever get a call from Mr. Aber?

A. No. I believe I was even asking for Mirim in all sincerity, but I don't know if that was her standing there because they kind of like laughed at me.

Q. With respect to the name "Aber," do you know if that is a common last name in the Orthodox Jewish community?

A. Not that I heard of, no.

Q. When you went back and looked at these old fires and saw that at least with respect to the fires at 1021 and 1025 that the name on the fire report was Nachum, did you do any investigation to try to determine



B. Santangelo

whether or not Mr. Aber was an owner of those premises at the time of the fire?

A. I think I did a LexisNexis. I mean, I have LexisNexis.

Q. Did your search on LexisNexis uncover anything regarding Mr. Aber?

A. Just the more properties that they appear to own under the Aber name. I'm not sure whose name it was under the wife or, you know.

Q. Other than concluding that they were the unluckiest people alive, did you reach any other conclusions with respect to the Abers and these fires that you identified?

A. No. But I think that it's something that I may have to bring insofar as I don't really know what was claimed. All I know was that there was a foreclosure and the best I knew was there was no money being transferred which gives to motive but any of these cases that are marked closed can be reopened at any time because that's what I did at ATF. As long as there is money, it can get handled. It's five to seven years and I think five years for the state that from the last payment, the case can be reopened and looked into.

Q. Has the November 6, 2006, fire been reopened?



B. Santangelo

A. No. None of them have been reopened. None, whatsoever.

Q. And as we sit here today, do you have an opinion as to what the cause was for the November 6, 2006 fire?

A. Only by what I read in the fire report which indicates it was an incendiary fire.

Q. And you have no other independent --

A. No. By all means, no.

Q. And as we sit here today, do you have any opinion as to who was responsible for setting the November 2008 fire?

A. Not at all.

Q. And other than what you just indicated to me regarding your involvement starting in December of last year, have you attended any meetings or had any discussions with anyone else within the department about the Abers?

A. I just explained to my boss that there is a whole bunch, you know, because he was the one that originally went to the meetings. I never attended the community meeting.

Q. So other than just filling him in on the fact that there have been several fires on properties where



B. Santangelo

the Abers had been identified as the owners, were there any discussions or meetings about that?

A. No.

Q. Have are you spoken to anyone from the America Insurance Company regarding the Abers?

A. Yes. Mr. Quinn.

Q. And how many times have you and Mr. Quinn spoken regarding the Abers?

A. Once in person and maybe a few times on the phone.

Q. And when was your meeting with Mr. Quinn in person?

A. Honestly don't remember. Had to be this year.

Q. And where did that meeting take place?

A. In my office.

Q. And how long did you meet with Mr. Quinn?

A. An hour maybe, the most. It couldn't have been hour.

Q. And what did you and Mr. Quinn discuss?

A. This particular building and other fires.

Q. The other fires that we've talked about today?

A. Yes.

B. Santangelo

Q. Did you show Mr. Quinn any documents in connection those other fires in your meeting?

A. I showed him the addresses where it was and we just covered a little bit on the face sheet. But I explained it to him. I could have showed him the entire reports but I didn't know whose side he was on.

Q. With respect to the fire back in May of 2004 to the 1021 - 42nd Street premises, was a cause ever determined?

A. Yes, I believe it was -- well, let me look. 1025 we discussed?

Q. I just asked you the 5/31/04 fire to 1021 - 42nd Street.

A. It was an incendiary fire.

Q. And what about the June 4, 2004 fire to 1024 - 42nd Street?

A. It was an incendiary fire with flammable liquid.

Q. And were any arrests ever made in connection with either of those two fires?

A. No.

Q. And with respect to the properties at the time of the fires, were they both vacant?

A. 25 was.



B. Santangelo

Q. And what about 21?

A. It's not on the fire report, but the indication the fire extended to wood studs and sheathing within the east wall would indicate the possibility of being vacant, but nowhere on here does it actually say it was vacant.

Q. And were there any witnesses to either of those two fires?

A. I am unable to determine.

Q. Any reference in either of the reports as to any witnesses to those two fires?

A. No. Because they are not showing up for some reason. I have no idea.

Q. And what about the 1230 - 42nd Street fire? Sorry to make you pull them out again. But what was the cause of that fire?

A. 1230?

Q. The one belonging to the other Aber?

A. 1230. Incendiary fire, flammable liquid.

Q. And what was the status of those premises at the time of the fire, were they occupied or vacant?

A. It's not indicated on the face sheet -- wait a minute -- not indicated on the face sheet.

Q. All right. You indicated, in addition to



B. Santangelo

meeting with Mr. Quinn, you spoke to him on the phone; is that correct?

A. Yes.

Q. And how many times have you and Mr. Quinn spoken?

A. A couple times. I don't know the exact number.

Q. When was the most recent time you spoke to Mr. Quinn?

A. Last week.

Q. And what did you and Mr. Quinn discuss during that conversation?

A. That I called here to let you know I'm going to a funeral. A firefighter passed away and I was doing security and that we changed the date over the phone to the 27th and I'm just giving you a heads up.

Q. I understand when you met with Mr. Quinn, you discussed the different fires that we talked about today. Did you discuss those fire with Mr. Quinn in any of your phone conversations with him?

A. I'm not sure, but I very possibly could have. If I may say so you understand, this entire thing I that did was cursory, that's why I don't have any notes because it wasn't an official investigation or I would



B. Santangelo

keep notes, keep my contacts with you or that because it didn't mean -- you know, it does mean anything. What I did was just do this so I knew exactly what was happening on the case. So that's why I don't have any notes. I didn't write anything because I, as a supervisor, cannot do an investigation, it's has got to be a marshal. It's a union issue.

Q. As you sit here today, do you have any plans to continue your investigation into these fires?

A. I am going to express this to my boss. I don't know what they want to do, but me personally, what I did was done back then and that's the end of it.

Q. Okay.

MR. LERNER: Off the record.

(Off the record.)

(Brief recess.)

MR. LERNER: At this time Fire Marshal Santangelo, subject to any questions Mr. Quinn may have I have no further questions.

EXAMINATION BY MR. QUINN:

Q. Fire Marshal, it's been established on the record that we have met previously. Any way I'm going to have some questions about both your investigation and some of the procedures of the fire department.

B. Santangelo

With respect to any file that is open by the fire marshal's office, is a number assigned to it?

A. Yes.

Q. Is every fire that is reported assigned to the fire marshal's office to investigate or are there some that don't ever see the office?

A. There are some that don't see our office.

Q. What determines whether or not your office gets it?

A. There will be a fire chief on the scene. He will go on the scene, he will look at the fire and say, I don't know what the cause of this fire is, have the fire marshal come in. Serious injuries, deaths, we will do that, we're automatically in. Vacant buildings, we are also, because it's obviously a crime, it's a vacant building and they will call it in. They will give the code a 10-41-1 which indicates suspicious fire. It's really not a good code because he is not -- it could be he is saying suspicious, but otherwise he doesn't know what caused the fire. And on occasion we will go and find out it is electrical and that, you know, it don't mean anything.

Q. Do you know why this fire, the one at 1037 was assigned? Is it because it was a vacant building?



B. Santangelo

A. By what I read on -- well, let me just see what he did -- yeah, I'm going to say because it was a vacant building.

Q. You stated before that if you were doing an investigation, one of the determinations you would make as a fire marshal was whether or not the building was insured. What is the significance of this to you if a vacant building was insured?

A. Well, not that the -- to be charged with arson there is not really a motive, you don't need a motive; however, there is usually a motive. What I personally have found -- a building is vacant but my determination is, is it owned or did, like, I have no more money and I can't afford the building anymore so let the City do what they want to do. In that case it's financial, the guy leaves it open, he lets people, squatters go in there and do what they got to do and he don't care anymore.

If I do the investigation and it's listed as a vacant building, run it through the financial, see who is paying the bill, and if, in fact, that's still the case that they are paying the taxes on it or what have you, if I find somebody is, then my next thing is I want to find out why, how this happened, what is going on.



B. Santangelo

Because I do know that a vacant building insurance is very expensive and that, in fact, you have to, again if you got a vacant building you got to board it up, you got to keep these people from going in there. And a lot of time which was done in previously places, we got a P&A from the owner, permission and authority. You see someone in there, you can go and take them right out. You can arrest them for trespassing.

Q. So if somebody was insuring a building and continuing to pay both the taxes and the mortgage on that building, but leaving it vacant and allowing squatters to live there, would that have any significance to you as a fire marshal in terms of just being of interest to you?

A. Me personally, yes.

Q. And why?

A. Well, because in this particular case, what I learned was that two buildings or three buildings on the corner owned by the same person are now these buildings. Which was pointed out to me when I spoke to -- which was pointed out to me when I spoke to Gonzalez or one of them when I went there.

Q. Did Mr. Gonzalez indicate to you that the person who owned the building, the building at 1021 and



B. Santangelo

1025 was the same person or same family who owned the building at 1027?

A. That's what she said to me.

MR. QUINN: And you marked the other two photographs. Why don't we have those two marked also?

(Document marked Santangelo-6 for identification.)

(Document marked Santangelo-7 for identification.)

BY MR. QUINN:

Q. Fire Marshal Santangelo, I'm going to show you what has now been marked as Santangelo-6 and 7 and just ask you to identify for the record what those show.

A. Yes. This is the site as you see it. One photograph marked Exhibit-6, I took that picture because it shows the addresses on the buildings, 1025 and 1023. There is another building on the left but unfortunately my camera was not a wide lens.

In the exhibit marked No. 7, I believe that shows the 1021 in here which is now looks like a four-family or so individual, maybe 16-family, 12-family homes.

Q. And you took these photos because Mrs. Gonzalez told you that the same people owned 1021 through 1025 as owned 1037?

Page 54

B. Santangelo

A. Yes. She said that the people who owned this owned that.

Q. And did she also indicate who the owner to 1039 was to her knowledge?

A. She kept referring to the same people.

Q. Did she know their name?

A. I don't recall.

Q. Was she able to direct you -- you indicated that you did go look for Mr. Aber or Mrs. Aber, one of the Abers, on that day; is that correct?

A. Yes.

Q. And how was that person identified to you that you knew who to go look for? Or was it because you already had a record of 1020 -- or the 1037 fire?

A. No. I knew about -- either I did a LexisNexis to find out his address. I don't recall how I had it, but I knew it was the 1100 block. I don't remember if anybody pointed it out. I believe I did like just a little background before I got to the scene so when I did speak to those people to see what their problem was I would be a little bit more intelligent.

Q. Were you aware, do you remember, before you went out there you already knew they owned other properties on that street?

Page 55

B. Santangelo

A. I'm not sure.

Q. Had it been identified to the fire department as a problem that seemed to be related to one owner about this concern that was going on, on the street?

MR. LERNER: Note my objection. You can answer.

THE WITNESS: No.

BY MR. QUINN:

Q. It was just a general problem that was being described to the department?

A. Again, it was through the mayor's office because of the tenant -- not the tenant -- the people, Gonzalez, at the prior address that we mentioned seemed to be the only house there. Everything was burned from her left to her right. She had explained to me that she had Allstate Insurance and Allstate was going like why do you keep putting in for fire claims.

I subpoenaed Allstate to which I only noticed I still have a cover sheet for faxing it to them. I never pursued it but as of this date, I never received it either.

Q. When you did the search to determine the owners of the properties, you determined who was the record owner for 1039?

Page 56

B. Santangelo

A. Who was?

Q. Yes.

A. According to the report of February 26th of '08, it was Mirim Aber.

Q. And that 1037 was also Mirim Aber?

A. On 11/26 of 2008, 1037 - 42nd Street was Mirim.

Q. But on November 6th of '06, who was identified as the owner?

A. Nachum.

Q. Do you have any knowledge as to why there is a discrepancy as to the two dates of the ownership?

A. The first names?

Q. Right.

A. I have -- no.

Q. Did you ever determine who the record owners were at the time of the fire at 1021 - 42nd Street?

A. Yes. According to the fire report dated May 31 of 2004, the 1021 - 42nd Street, they have it as Amber Nachum.

Q. And does it give an address or anything other than the 1021 address?

A. 1168 - 41st Street.

Q. Did you ever determine whether or not 1168 -

Page 57

B. Santangelo

41st Street was a property owned by Nachum Aber?

A. Well, on ten twenty -- on June 5th of 2004 for the address 1025 - 42nd Street, the correct reading is Nachum Aber and it shows an address of 1168 - 41st Street in Brooklyn.

Q. On the fire reports is there any address given for Mirim Aber?

A. 1039, okay -- February 26th of 2008, it shows address of owner 1039 - 42nd Street, Brooklyn.

Q. Do you know if that property was, the 1039 property at the time of fire on November 26th of '08 was occupied? The 1039 property, was there any indication of whether or not it was occupied at the time of it's fire on February 26th of 2008?

A. No. This is the photograph that I took, Exhibit No. 5.

Q. Right. That was in December of '08. What I want to know does the record show with respect to the fire in February of '08 whether or not that property was occupied at the time of the fire?

A. No. Vacant.

Q. So there is no indication of what her actual residence address was, where she was living at the time of that fire, is there?

B. Santangelo

A. 1039 - 42nd Street?
Q. Right.
A. Dated February 26th, it shows that she is living at 1039 - 42nd Street.
Q. But the record also indicates that the property was vacant?
A. That's correct.
Q. Have you done any further investigation beyond looking at the fire report with respect to the fire at 1021 - 42nd Street in May of 2004?
A. Did I?
Q. Do any further investigation to determine whether or not, for example, that property was insured at the time of the fire?
A. No, I didn't check into any of that.
Q. Is that true also with respect to the 1025 - 42nd Street; did you check to determine whether or not it was insured?
A. No, I did not check into that.
Q. Did you do anything to check to determine who the current owners at 1021 - 42nd Street are?
A. I did a LexisNexis on the people. I would have to look to see if it came across.
Q. Okay.



B. Santangelo

A. So I honestly can't tell you at this point.
Q. I guess that's a matter of public record as to who owns it.
A. Yes.
Q. Did you do any determination of the property, what occurred with the transfer of property with respect to 1021 after the fire in 2004?
A. No.
Q. As a fire marshal, the fact that one -- well, a husband and wife who own properties on a street that each of the properties, or at least three of the four properties suffered fires while the properties were vacant, as a fire marshal does that have any significance to you?
MR. LERNER: Object to the form.
THE WITNESS: To me personally, yes.
BY MR. QUINN:
Q. Is that based on your experience as a fire marshal?
A. Yes.
Q. And how? What does it mean to you?
A. Because I was involved with, as I said, from '97 to 2005, I was involved in a particular case which opened up which I learned a lot more and I only wish it



B. Santangelo

was earlier in my career, so I learned a lot.
Q. And what you learned, does it affect your view of the situation on 42nd Street in Brooklyn as it relates to the Abers?
MR. LERNER: Note my objection.
THE WITNESS: As I said as we sit in this room if, in fact, we can, we probably can say, you know, I saw fire or I need a fire -- I mean, you know, I've seen a fire or I've been to a fire or what have you. What gets me as an investigator is that someone that has properties specifically on the same block that has fires in them caused by, at this present time, unknown people, would make me want to wonder and do at a deeper investigation as to how this occurred.
Q. With respect to the fire on November 6, 2006, do you know if any determination was made as to whether or not the building was secured prior to fire?
A. In 2006?
Q. Yes.
A. The only thing that would indicate to me is the interview from Lieutenant Farinacci which states -- the interview -- heavy fire condition on the second floor. He further stated that there was some homeless persons leaving the building upon his arrival. He



B. Santangelo

further stated he wanted to stop them but was too busy with his firefighting duties. The next thing would be to investigative notes written by fire marshal Farrel, the subject premises was a vacant private dwelling; reports of homeless person staying in the subject premises, no electrical in the subject premises. Several phone calls to the owner produced no information. Recommend this case be closed pending further information.
Q. You've indicated that -- and I may not be saying this right -- strike that.
Is there a manual or anything like that within the fire marshal's office that explains the steps that a fire marshal should take in investigating a fire?
A. No, because it's never cut and dry. It depends on how they teach you, what you do. I was fortunate enough -- a lot of fire marshals work two days on and then one night tour. So what happens is then they are preliminary front. There's a fire. There's a fire in a building or whatever it is. A job ticket comes in, they have to go out to the fire, they have to decide what the origin and cause was of this fire. Now they get back and they have to do the paperwork. Well, on your way back stop off at 42nd Street and there is a

Page 62

B. Santangelo

job there that you have to take care of. We got two injured fire fighters. So now the whole ball game goes to there. So sometimes the paperwork -- which is what my problem is -- might not get in on time. So they have to get the paperwork in.

So now if something stands out -- which some of the major fires that we've had in the City and some of the major incidents -- what they will do is give it to our special investigations unit, which is composed of four or five guys, right now a supervisor, and their job is to do major cases.

I was fortunate that I worked in SIU in my beginning time as a marshal. In 1990 I was put in SIU, and that is where I learned different aspects, you know different phases, when you have the time to do it. The average fire marshal does not have time to go back the next day to see what is going on with this fire. So therefore, it just sits. They won't come up and they won't go, you know, listen, I got this fire that has 76 fires, you know -- because we do have a problem with Brighton Beach and we address every fire now on Brighton Beach because of things that were going on to some success -- and that's what I mean, unless these things were brought out, the spanning of the years and the

Page 63

B. Santangelo

being unable to look further, Okay.

So when I see a job, if I see one job my curiosity was, are there more jobs, and if there are, now you just did it to me.

Q. You previously identified the fire marshals who did the investigations at the 1037 and the 1039 locations. I guess one of them was Fire Marshal Orlando, is he still with the department?

A. Yes, he is.

Q. And you indicated that Fire Marshal Stevens is not.

A. Stevens is promoted to a lieutenant. He is accessible.

Q. So he is still with the fire department?

A. Yeah.

Q. And how about Fire Marshal Farrel?

A. Mike Farrel is in City Wide North, which is Queens based.

Q. How many sections are there, Just south and north?

A. Now we have two, yeah. We are two, we have a unit in Manhattan on Lafayette, our auto squad is there. And at Hooper Street is our special operations. They receive the jobs, they give out the job.

Page 64

B. Santangelo

Q. And then there is north?

A. And then there is Queens, north, which covers Queens, Bronx and from 110th Street up in Manhattan.

Q. How about the fire at 1021 - 42nd Street, who was the fire marshal on that job?

A. That's Dominick Curci, but he is retired.

Q. And do you know where he is?

A. I'm sorry?

Q. Do you know where he lives now?

A. I'm not sure if he was from Staten Island or Brooklyn. I think he may still be around somewhere.

MR. LERNER: Can we just get a spelling for the court reporter of the last name?

THE WITNESS: First name Dominick. Last name C-u-r-c-i.

BY MR. LERNER:

Q. I'm sure the fire department has a record of him because I'm sure he is getting a pension check somehow.

A. Oh yes. If you go through the league, they will find him.

Q. And how about the fire at 1025?

A. Thomas Boyd. Tommy Boyd works at City Wide North.

Page 65

B. Santangelo

Q. So only Fire Marshal Curci is no longer with the department.

A. Yes. Dominick retired.

Q. So you have five different marshals for five different fires; is that correct?

A. That's correct. During that period of time, yes.

Q. And how about the fire at 1230 - 42nd Street?

A. That was Daniel Caruso, C-a-r-u-s-o.

Q. And how about him, is he still employed?

A. As a matter of fact, he just got promoted to supervisor and will be reassigned to my office.

Q. On the report, the fire incident report that has been identified as Santangelo-2, is there any indication whether or not the fire marshal was able to speak with the owner of the building?

A. Looking at Exhibit-2, reading the fire marshal's notes, it says, several phone calls to owner have produced no information.

Q. Do you know if there was a response or just no information given?

A. No. No. There would be no response.

Q. In your experience as a Fire Marshal is that unusual that an owner of a property would not respond to

Page 66

B. Santangelo

your calls if they were paying the mortgage and paying the insurance on a building?

MR. LERNER: Note my objection.

THE WITNESS: It's a...

BY MR. QUINN:

Q. And they were not respond to the inquiries from the fire marshal?

A. We are all aware that it stipulates in your insurance papers that you have to cooperate with the law enforcement on any investigation to any fire. I believe that's the first page of the document that most of us don't read.

Q. Do you understand that most people do respond to your request to contact you if they are insured and paying the mortgage?

MR. LERNER: Note my objection.

THE WITNESS: Eventually, if they are paying. If we do percentages, I would say yes, because they are aware. Because the process that they go through is the adjuster, is the people that investigate that are sent out by the insurance company, they are going to confirm with us, we are going to confirm with them, and they are going talk to us because that's what they have to do.

Q. Is there any reference on this report to any

Page 67

B. Santangelo

adjusters or people retained by the owner contacted the department about this job?

A. No.

Q. Is it usual or often that adjusters, public adjusters, retained by owners contact the fire department about a job?

MR. LERNER: Note my objection.

THE WITNESS: What happens is this, it's not so much the adjusters as the insurance company. The insurance company will have their cause and origin guy go out and their cause and origin guy will contact us because by law -- it's the same law within the Arson Unity Act. We can confer with each other because it's the same goal and as long as the information data shared is truthful, there is not a problem. So nobody is held liable.

So with that, usually what happens is they will call us and they say who is working on the case, and we will say somebody is working on it, what do you got? Well, I got five million dollars, this guy has five million dollars. Okay, this is what we got. Let's meet. Let's do it. The case would not have been closed.

Q. You testified that you spoke with this

Page 68

B. Santangelo

Valerie Gonzalez, did you speak with anybody else that lived in the area?

MR. LERNER: Note my objection. I think he said Valerie Gray.

MR. QUINN: I'm sorry. Valerie Gray.

THE WITNESS: It was Mrs. Gonzalez. There was three people.

MR. LERNER: Richard Gray and Valerie Gray and you said Mrs. Gonzalez.

THE WITNESS: Right. There were three people living in there. They were community activists and I was trying to pacify them in one breath.

BY MR. QUINN:

Q. Okay. So they all spoke with you about this?

A. Yes.

Q. Anybody else in the neighborhood that spoke to you about this?

A. I don't believe I went past that because that was my goal.

Q. Can you describe at all, you said you went to the property on 41st Street to try to locate the Abers, Mrs. Aber, could you described the people you saw there?

A. In the basement?

Q. Right.

Page 69

B. Santangelo

A. Again, I'm wasn't sure it was 41st Street, I believe it was 41st Street. And I believe the way I found it was there was a sign, some construction company that turned into another construction company. I went there.

Describe it. To the best of my recollection, they opened it up -- they were standing, I believe they were standing down and I was standing up, you know what I mean, a high step, I think. The woman seemed to be a naturally Hassidic woman with the wig, she had a long-haired wig. She appeared to be short, I don't know how tall -- how do I say this without getting in trouble? She wasn't heavyset, but she was full-boned -- am I saying that right? I'm going to get in trouble.

Q. How about the gentleman? Were you able to tell age?

A. No. He was Hasidic with black hair and a beard. They are very jolly people. He just kept laughing while I kept talking.

Q. Did you tell them why you were there?

A. Yes, I said I'm a -- because I would always do that because, if you know what I mean, I needed to talk to these people and I didn't want to scare them off -- I said I'm a fire marshal and I'm here, I'm

B. Santangelo

looking for Mr. Aber and all that. I think he said to me that was his sister or something along those lines, which I tend not to believe any way. I said here's my card. Please have him call me.

Q. Did you ever tell him that you were on 42nd Street?

A. I don't think I got into the whole thing. I think I said I was investigating a fire on whatever that address was, that I was looking into it and I knew he was the owner, otherwise I won't have been there. I had no reason to be at this guy's house.

And, again, there was no notes and no further pursuing of it because at that point I didn't think there was going to be anything done with it and there wasn't money and I just mentioned to my boss that it wasn't going to go anywhere at that time.

Q. With respect to the fire in November of '08 at the 1037 address, where did the damage in that fire occur?

MR. LERNER: I'm just going to object to the form of the question.

THE WITNESS: I'm reading off the face sheet: "Fire originated at subject premises on the first floor on the exterior front porch adjacent to the east brick



B. Santangelo

porch rail approximately two feet from the north wall at the floor level in combustible material clothes and cardboard. Fire extended to the front porch walls, ceiling, and contents, further extended to the second floor front and exterior where it was confined and extinguished."

Q. When you were at the scene that day, did you walk around the building at 1037?

A. I didn't go in the back but I went down the alley just to look at the electric.

Q. Was there any indication whether or not the electric was operating?

A. No, the electric was off.

Q. Did you observe at all whether or not the windows in the building were boarded up?

A. I don't recall.

Q. There is mention of Robert Wing. Who is Robert Wing, do you know?

A. Robert Wing?

Q. Are you familiar with his name at all?

A. No. He may have just been a firefighter.

Q. It appears he was just a firefighter not somebody in your department.

Other than the steps you've taken after you were



B. Santangelo

brought into this matter in December of '08 and I suppose what your commanding officer may have done prior to that in connection with these community meetings, do you know if after Fire Marshal Farrel completed, closed his case, anything was done in between those two dates?

A. No. I do not see anything that would give me an indication that anything was done. Period.

Q. And these other fires, the 1021, the 1025 - 42nd Street and the 1039, were those investigations similarly marked closed?

A. Yes.

Q. And was anything done on those to your knowledge up until the time that you began what you described as your cursory --

A. No. Only what I could read in the report, which is what I said.

Q. Have you determined who owned the 1021 building?

A. Well, according to what I got out of LexisNexis, it shows that Nachum Aber owns it.

Q. Does it indicate what the date of that record is, not the date you got it, but the date that it's reporting that Nachum Aber owned the property?

A. Again, it just says, Deed record standardized



B. Santangelo

address 1168 41st Street, and then it says Property information, and then 1021 - 42nd Street, Brooklyn, duplex, triplex, quad-plex, which described that.

Q. Described the building?

A. Sure. Triplex, duplex, all those other fancy terminologies got to be this big building because the other ones were just one families. And it says the recording date was May 18, 2004, contract date was December 26th of '03.

Q. Did you make a similar determination with respect -- well, 1025, you have already indicated what the fire department record showed.

A. And 1025 was also owned since 2003 according to the recording data on this thing.

Q. With respect to the what is reported on the fire incident report, which is Santangelo-2, from that, were there any New York Department fire department code regulations or City regulations to your knowledge that from the information contained in there were violated by the owners of that property at the time?

MR. LERNER: Note my objection.

THE WITNESS: I won't know from that. It's very possible it's in that fire incident report, that other report -- sometimes they put it in there.

B. Santangelo

No, looking through here I have no indication that any summons, violations, or anything were given.

Q. To your knowledge, is the owner of a building required to secure a building to prevent access -- in other words, a vacant building, required to secure the building.

MR. LERNER: Under what? Under a code or law?

BY MR. QUINN:

Q. Under his knowledge of New York law is the owner of a vacant building required to secure the building?

MR. LERNER: Note my objection. You can answer.

THE WITNESS: Yes. And I did that at Brighton Beach. I demanded that he boarded up the building?

Q. Pre-fire or post-fire?

A. They had a fire -- we were having a lot of fires there and one of deals were we found out he was trying to get the buildings by letting homeless live in there and burn the building so that the City would come along and knock the building down because he was having problems selling the building.



B. Santangelo

So I kind of explained to him that this building has to be boarded. And then we pursued it that way to which he boarded it up. I went back on two occasions to make sure the building was boarded.

Q. Was that before or after a fire?

A. It was after the fire.

Q. How about before a fire? Is the owner of a vacant building required to secure the building?

MR. LERNER: Note my objection.

THE WITNESS: I don't know the law, but I would imagine that the insurance -- I would imagine, my opinion that the insurance company, if you insure a building, you are not going to leave it open.

BY MR. QUINN:

Q. I'm talking about the law, not necessary what is reported by the insurance company.

MR. LERNER: Note my objection.

THE WITNESS: I don't know the law, but I would believe there is.

BY MR. QUINN:

Q. But after a fire, is it a requirement to board up a building?

A. It's almost spontaneous because the insurance company sends down a boarder, he boards it up and that's



B. Santangelo

pretty much the end of it. That's what we normally see.

Q. When did you first become aware that the property at 1037 was, in fact, an insured building?

A. I think on one of our conversations, I think.

Q. And did you ever make a demonstration whether any of the other buildings were insured at the time of their fires?

A. No.

Q. Did you ever become aware that the property at 1037 is subject to a foreclosure action?

A. I did but I forget where I learned that. I don't know if I learned that on something I pulled. I'm not sure where I believe -- where I learned it. I heard it.

I want to make a correction on something that I said. I believe I said I first learned it from you about the insurance of this. I don't think it was you because I see I have, I have something here and I don't know if I spoke to a Mr. Gross prior to speaking to you. I'm pretty sure I did. And I believe that's where I got some of the information from.

Q. Has anyone at the mortgage company claiming that they held the mortgage to the property contacted you at any time?



B. Santangelo

A. No.

Q. Have you ever been contacted by any other insurance company regarding the Abers?

A. No.

Q. By the way, you mentioned your commanding officer. What is his name?

A. Randal Wilson.

Q. And he is the commanding office of the --

A. Yes. He is the commanding officer of City Wide South.

Q. In conducting an investigation, do you consider the financial affairs of the owners of a building as you analyze the fire losses?

A. Yes.

Q. And in what way or what is the significance of the financial affairs to you in conducting such an investigation?

A. Well, the quite obvious is, did they have the money to pay the mortgage? Are they paying the mortgage? Because it's easier to light the house up and get -- you know, it's the same as a car. You know, today people with the SUVs, they get two gallons per mile. Well, they are not going to trade it in, they are going to get 35 hundred bucks versus having a fire and

B. Santangelo

fire theft on a car. And that happens.

Q. Do you know anything about the financial conditions -- affairs of the Abers?

A. No.

Q. Do you know Malik Aber?

A. No, I don't know any of those people personally.

Q. So you never spoke to Malik Aber to your knowledge?

A. No.

Q. Other than maybe he was that person that you referred to before?

MR. LERNER: Note my objection.

THE WITNESS: I won't know. I won't know any of them.

BY MR. QUINN:

Q. Have you learned that the properties at 1037 and 1039 - 42nd Street have been demolished?

A. Yes.

Q. Do you know if the fire department had any involvement in the decision to demolish the buildings?

A. I don't know.

Q. Does the fire department from time to time get involved in determinations as to whether a building



B. Santangelo

should be demolished?

A. No. It's the buildings department.

Q. Do they consult with you at all or do they just make at a decision themselves?

A. I've never been consulted. There is a process -- if a building gets -- if they demolish a building because it is an unsafe condition and the owner doesn't do it, they will do it and I believe they charge them three times more the amount to demolish it, if you can find the owner, I believe that's the way it works.

Q. Do you know anything about the demolition of those two buildings?

A. No.

MR. QUINN: I believe that's all I have. Thank you very much.

BY MR. LERNER:

Q. Fire Marshal, just a couple more follow-up questions for you. I believe you indicated that you had learned at some point that there was a foreclosure action started against the 1037 premises; is that correct?

A. I heard. What I heard was the people who owned that building are in foreclosure and they have no insurance. Okay. Exactly, I really don't recall who I



B. Santangelo

learned it from, but those exact words that I remember hearing.

Q. Did you learn at what point foreclosure actually was started; and by that I mean, do you know if it was started prior to the November 6, 2006, fire?

A. No.

Q. And you mentioned Mr. Gross. Who is Mr. Gross?

A. Mr. Gross -- I can't remember how I got in touch with him -- Mr. Gross works with Insurance Solutions in Staten Island.

Q. And who is Insurance Solutions?

A. I don't know. They may be the insurance company for all I know. I don't remember how I even got hooked up to that guy Keith Gross. He may be -- he may be like a Mike Russo -- I don't know. I never heard of this guy before.

Q. He may be a cause and origin investigator?

A. Maybe. I don't know.

Q. Do you recall what you discussed with Ms. Gross?

A. Yeah. What do you know about this thing?

Q. And how long did you speak to him for?

A. I don't know.



B. Santangelo

Q. When did you speak with him?

A. I can only tell you that it was before April 11 -- no, I shouldn't even say that. I don't know when I spoke to Mr. Gross.

Q. And you have no notes about your discussion with him, correct?

A. That's correct.

Q. Now, previously you indicated that it's your belief that insurance policies contain provisions requiring the insured to corporate with police and the fire department; do you recall that?

A. With investigations, yes.

Q. And that's just based on your believe, correct, not based on any personal knowledge that you have?

A. I believe it's in the insurance policy. Where exactly -- I remember them showing it to me a hundred years ago, but I just can't tell you what page. But I believe it is still there.

Q. But again, it's based on your belief as to what you may have learned years ago as opposed to what actually exists within the policy that maybe issued in this particular incidence, correct?

A. Oh, I don't know anything about this

B. Santangelo

incidence. I'm talking about general fire that I am aware of which I used for the longest time. I've had Chinese people speak to me after they found out I called their company and said they are not cooperating so they are talking either a blitz language in five minutes or -- so no matter what the property was, commercial or -- when I was deeply involved with except for one incident.

Q. And with respect to this particular investigation of the November 6, 2006 fire, is there any reference in the fire marshal's file report of any contact made with him by the insurance company?

A. No. I believe I looked through that. There is no indication.

Q. All right. And with respect to the addresses that we see. For instance in -- withdrawn.

With respect to the identity of the owner that we see in this report and in the other reports that you looked at, where does that information come from?

A. It would probably -- because I don't know 2006 -- it would probably come from the financial records or the buildings records.

Q. And who is responsible for obtaining that? Is that something that the fire marshal does? Is that something that the administrative people do?



B. Santangelo

A. It would be -- the fire marshal would contact Hooper Street, okay, and say, look, give me -- we want to know who owns this building or they'll go on the computer to finance -- now today, we can all go onto the building or financial department and find out who owns what or run a LexisNexis.

MR. LERNER: Thank you, Fire Marshal Santangelo. I have no other questions.

BY MR. QUINN:

Q. By the way, you talked about this Brighton Beach investigation, is that the Schlesinger case or is that another matter?

A. No.

Q. You testified that there was a situation in which a fellow was allowing homeless people to reside in the building?

A. Yeah.

Q. When I say "allowing," you determined that it was his intent was to have the homeless people cause a fire in the building?

A. Well, a lot of that is still going on under investigation. But hypothetically speaking, what the problem is that the gentleman purchased -- we are having a lot of problems in Brighton Beach. What is happening



B. Santangelo

is vacant buildings are burning down, foreclosures are happening, so there is a particular area that this is going on in. I'm trying to be vague without --

Q. I understand.

A. So what happened is in this particular incident that I got involved with again was that there was a fire. And then there was another fire like a couple of days apart. And the boss wasn't in so they sent me down there with a team. And I went down and there I learned that there were multiple family houses used as SROs and there were fires --

Q. SRO?

A. Single room occupies. What was a three-family was now a sixteen-family or a sixteen-person room. So what had happened was he was -- he had a fire and the last house left, he just kept moving the people. He would throw people out and move them into the last one.

I got word from the street that his intention was to get these buildings down because there was something going on, there was an ordinance that was going to be passed within a certain amount of time, and in order for him -- he had to have the buildings demolished by this time, otherwise he can't build what he wants to build,



B. Santangelo

which was built on the next block.

So I went down there and asked them to get the owner. The owner came, everybody came, the investor, and this and that. And I said what is your plans here, and basically he said, somebody is interested in it. I said, well are you going to board this up? And he goes, well, now we have the damages. I said no, we were going to board this up. What is your intention? And we went on and on.

And I just informed him that you have an SFO, you have these people living here, you have firemen respond here, and I believe that you should board this up because should a fireman get hurt, should a civilian get hurt, we are going to have major problems. So just to help everybody out. So I stood there and he had something with his insurance company because they called me. And I verified to them, I said I was there and that building is boarded up. And, you know, that was all I wanted him to do.

He also give us permission and authority that if anybody entered his building we can arrest him. We gave that to the local police and on occasion somebody would take a ride -- if they were in the area, of course -- and go in there. If somebody was in there or it was

B. Santangelo

unboarded, he gave me his number to contact him and left somebody to board it up. So I'm a happy camper. I did what I had to do and, you know, he really cooperated.

MR. QUINN: Okay. That's all I have.

(Witness excused.)

(Deposition concluded 12:29 p.m.)

____________________________

BERNARD SANTANGELO

Subscribed and sworn to before me

This___day of ______________, 2009.

____________________________

NOTARY PUBLIC



INDEX


| WITNESS | PAGE |
|---|---|
| BERNARD SANTANGELO | |
| By Mr. Lerner | 4, 79 |
| By Mr. Quinn | 49, 83 |


EXHIBITS

PLAINTIFF'S EXHIBITS:


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Santangelo-1 | Subpoena. | 4 |
| Santangelo-2 | Four-page Fire Incident Report, November 6, 2006. | 6 |
| Santangelo-3 | Three-page Fire Incident Report, November 26, 2008. | 8 |
| Santangelo-4 | Color Polaroid photograph. | 24 |
| Santangelo-5 | Color Polaroid photograph. | 24 |
| Santangelo-6 | Color Polaroid photograph. | 53 |
| Santangelo-7 | Color Polaroid photograph. | 53 |




CERTIFICATION

STATE OF NEW YORK )
: ss:
COUNTY OF NEW YORK )

I, TONIANN MCCULLOUGH, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 27th day of August, 2009.

ToniAnn McCullough,
Professional Court Reporter
and New York State Notary

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of



ERRATA SHEET

DEPOSITION OF: BERNARD SANTANGELO
RE: MIRIAM ABER VS. AMERICAN SECURITY INSURANCE COMPANY
TAKEN: AUGUST 27, 2009

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

____________________________

BERNARD SANTANGELO

Subscribed and sworn to before me

This___day of ______________, 2009.

____________________________

NOTARY PUBLIC