JAN 27 2009

בס"ד יום ג' בא תשס"ט פה ברוקלין נוא יארק

שטר מכירה והתחייבות שנערך ונגמר באופן סופית ובלתי חוזר ונחתם ע"י ובין הצדדים דלהלן, מוה"ר נחום ו\או רעייתו מרת מרים עיבערס ("צד א"), הר"ר זלמן אשכנזי ("צד ב"), (שניהם ביחד: "הצדדים"), בנוגע מכירת\קניית השטחים דלהלן, על הכתובת 42-1037 ("שטח א"), ועל הכתובת 42-1039 ("שטח ב"), (שניהם ביחד: "השטחים"), וכל הזכויות והחיובים המסתעפים ונובעים מאותה קנייה\מכירה, ושאר ההתחייביות שעל הצדדים, וכדמופיע כל זה בהסעיפים דלמטה,

והצדדים מאשרים ומצהירים בחתימתם דלמטה שקיבלו כל זה בכל אופן היותר מועיל עפ"י תורה ועפ"י תקנ"ח ועפ"י הנהוג ולהבדיל עפ"י חוקי המדינה, וגמרו כל זה מרצונם החפשי ובהתייעצות גמור, וכדלהלן:

1. צד א' מוכר בזה מעכשיו לצד ב' במכירה גמורה וחלוטה את 2 השטחים דלעיל, ומעכשיו והלאה מהווים רכושו הבלעדית של צד ב' לכל דבר, ויכול לעשות בהם כרצונו וכאדם העושה בתוך שלו, וצד א' מסלק מעכשיו את כל כוחו\רשותו\זכותו מעל השטח, ושאין לו -או לבא כוחו- שום טענה או מענה או כל זכות שיהיה בכל הנוגע להשטח. וכל זה נעשה על התנאים שבהסעיפים הבאים, והתנאים הותנו עליהם באופן המבואר בהפוסקים.

2. צד ב' נכנס להמקח על סמך ואדעתא דהכי שיהיה בידו לגמור המקח על שני השטחים הנ"ל, ושבשניהם יתהוו רכושו הבלעדית. היה ולא יוכל לגמור על אחת מהשטחים, אם יהיה באשמת צד א', או בגלל אי קיום אחת מהחיובים שעל צד א'. הוסכם שהברירה מעכשיו ביד צד ב' אם ירצה לבטל גם המקח שעל השטח האחר או לקיים המקח עכ"פ במקצתו, ואין לצד ב' שום תביעה על הכסף שכבר נתן לצד א'.

3. המכירה שעל שטח א' הינו בתנאי שצד ב' ישלם בעת חתימת ההסכם הנוכחי סך $100,000 בדמי המקח, מזה יינתן סך $80,000 לצד א', והנשאר בסך $20,000 יהיה למר. שמעדריא, ומיד כשיקבל שמעדריא את המעות הללו עליו למסור לצד ב' את המסמכים של הקארפ. הנקרא: VPI Properties LLC, שעליו הורשמה שטח ב'.

4. צד א' ישתדל להתפשר עם הבאנק על המארגיטש שיש על השטח הנוכחי, וזה מוטל על כתפי צד ב', וכדי לממש את ההתפשרות עם הבאנק באופן הכי טוב צריך שהצדדים יכתבו וייחתמו קאנטראקט ליגאלי על שטח א' בסכום של $220,000, וצד א' קיבל עליו לשתף פעולה ולעזור ולהקל על צד ב' בכל מה שאפשר.

5. הוסכם שאם יעלה ביד צד ב' לסדר עם הבאנק על שטח א', אזי צריך צד ב' לשלם עוד $150,000 לצד א' בדמי המקח הנשאר, ואח"כ כשייגמר להתפשר עימהם על שטח ב', ישלם עוד $50,000 לצד א'. היה ולא יגיע לעמק השוה עם הבאנק אלא קודם על שטח

ב', אזי משלם לצד א' רק $100,000, ושאר ה'$100,000 יתן רק אחרי שמתפשרי על שטח א'.

6. ובמקרה וצד ב' לא יבוא לעמק השוה להתפשר עם הבנקים, או לסדר המארטגיזשעס, ויעברו זמן של מאה ועשרים יום, החל מיום שנחתם ההסכם הנוכחי, אזי, חייב צד ב' לשלם כל דמי המקח עד תומו, דהיינו סך $ 200,000.00 והקלאזינג וה'Transfer of Deed יהיה ביחד עם התשלומין.

7. כחלק בלתי נפרד מעצם המקח הודבר והוסכם ע"י הצדדים בנוגע השריפה שהיה בשטח א', והבאנק גבה מעות מחברת הביטוח, וכו' וכו', שהמעות שכבר התקבל אצל הבאנק אין לצד ב' על זה שום טענה או זכות תביעה, ועל המעות שעדיין יכולים לתובעו מחברת הביטוח זה שייך אך ורק לצד א' בלבד, יהיה באיזה זמן שיהיה.

8. כחלק בלתי נפרד מעצם המקח הוסכם בנוגע השריפה שהיה בשטח ב', שכל המעות שיכולין לתבוע ולגבות מחברת הביטוח, שזה שייך אך ורק לצד ב'. כן סיכמו הצדדים כחלק בלתי נפרד מעצם המקח בנוגע ה'סעקאנד מארגיטש' שיש על השטח הנוכחי, שאם ישלם מו"ה עקיבא וייס מכיסו חלק מהמארגיטש הלזו, שכל אותו הסכום ינוכה מחשבון החוב להבאנק שנפל על צד ב' בקניית השטח.

9. "צד ב'" כולל את הר"ר זלמן אשכנזי באופן אישי, ו"צד א'" כולל את ר' נחום ואת רעייתו, וחתימת אחד מהם מחייב את השני באופן אישי ע"י שכל אחד מהם מהוה ערב בעד השני.

הצהרות: בנוגע לעצם תוקף השטר הנוכחי, הוסכם: א) היות וההסכם בנוי עפ"י דיני התורה ולהבדיל לפי החוק של העיריה של ניו יארק, לכן במקום סתירה תוא וההלכה קובעת, ב) שהצדדים קיבלו כל שיטה שמאשרת את הפרטים\תנאים\סעיפים שבשטר אפי' כשזה לפום שיטה יחידאי, ג) ראשי הפרקים וסדרי הדברים, בכללו או חלק ממנו, מיועדים רק לנוחות הקורא, ואין להשתמש בהם לפרושי הגדריהם, להרחיב או לצמצם את היקף ההסכם, ד) ההסכם הנוכחי מבטלת כל הסכמה\החלטה הקודמת, שבכתב או שבע"פ.

חתימת ידינו דלמטה מאשרת ומעיד עלינו שכל דבר ודבר בנפרד -האמור ב'9 סעיפים שבשטר זה המשתרע על 2 דפים- קבלנו עלינו באופן החלטי וסופית, בקנין אג"ס מעכשיו, ובשעבוד הגוף זה לזה, ובשעבוד כל נכסינו שיש לנו ומה שנקנה, ובהתחייבות גמורה, ובאופן היותר מועיל על כל חיוב וחיוב בנפרד, ושלא יבוטל דבר אחד המועיל מחמת דבר אחר שאינו מועיל, ואנו מודים בהודאה גמורה על כל הנ"ל, ושנעשה בבי"ד חשוב, ובאופן שאין בו אסמכתא, וחתמנו על כל זה מרצוננו הטוב, ומתוך הבנת כל דבר על בוריו וכל המשתמע ממנו, ובציפוי מראש על שינויים אפשריים בהעתיד, ולראיה באנו על החתום

צד ב' _____ צד א' _____ נחום אשכנזי _____

_____ 36 ____ ולא ידע שורש י' 36

JAN 27, 2009

God Willing, Tuesday, here in Brooklyn, New York

A deed of sale and undertaking entered into, finally completed and irrevocable, signed by and between the parties hereinunder Rabbi Nachum and/or his wife, Mrs. Miriam Ibarz ("Party A"), and Rabbi Zalman Ashkenazi ("Party B") (jointly: "the Parties"), relating to the sale/purchase of the Lots[1] hereinafter, designated 1037-42 ("Lot A") and 1039-42 ("Lot B"), (jointly: "the Lots"), and all the rights and obligations attached and relating to the said purchase/sale, and the remaining obligations of the Parties, as they appear in the following clauses.

The Parties confirm and declare by their signature hereinafter that they have accepted all this, in the best manner according to the Torah[2] and according to custom as distinguished from the secular Laws of the State and they have undertaken all this of their free will and after consultation, as follows:

1. Effective from this date, Party A hereby sells to Party B in a complete and final sale the two Lots mentioned above and, from now on, they constitute the exclusive property of Party B for all purposes and he may do with them of his own free will as a man treats his own property and, from now on Party A withdraws all his possession/right to the Lot, and neither he nor anyone acting on his behalf has any claim or complaint or any right in anything relating to the Lot. All this is done according to the provisions of the clauses below, which clauses have been applied in all finality.

2. Party B enters this transaction on the understanding that he will be able to complete it in respect of both the above Lots, which will constitute his exclusive property. If he cannot complete the purchase of one of the Lots, due to Party A's fault, or on account of the failure of Party A to carry out any of his obligations, it is agreed that Party B will then have the option, if he wishes, to annul the transaction of the other Lot or to complete the transaction in any event in part, and Party B will have no claim to the money which he has already paid to Party A.

3. The sale of Lot A is conditional upon Party B paying at the time of signing this Agreement, the amount of $100,000 in consideration, of which $80,000 will be paid to Party A and the balance of $20,000 will be paid to Mr. Shamadrah and immediately Shamadrah receives those amounts he will be obliged to transmit to Party B the documents of the corporation named VPI Properties LLC, in which Lot B is registered.

4. Party B will make an effort to reach an arrangement with the bank regarding the mortgage on the present Lot and that will be Party B's responsibility and in order to carry that out with the Bank in the best way, both Parties will draw up and sign a legal contract relating to Lot A in the amount of $220,000 and Party A will take upon himself to cooperate with and to assist and to facilitate matters for Party B to the extent possible.

5. It is agreed that if Party B succeeds in coming to an arrangement with the Bank relating to Lot A, then Party B will pay Party A an additional $150,000 as the balance of the consideration for the transaction and thereafter, when he finalizes an arrangement with them relating to Lot B, he will pay an additional $50,000 to Party A. In the

---

[1] Translator's Note: The actual Hebrew word used is "areas" but the word "Lot" is more appropriate in the context of a real estate sale.

[2] Translator's Note: The term "Torah" (meaning "teaching" or "instruction", sometimes translated as "law"), refers either to the Five Books of Moses (or Pentateuch) or to the entirety of Judaism's founding legal and ethical religious texts.

event that he does not reach an agreed arrangement with the bank but prior thereto, relating to Lot B, he will then pay Party A only $100,000 and the remaining $100,000 will be given only after he reaches an arrangement for Lot A.

6. In the event that Party B does not reach an arrangement with the banks and does not arrange the mortgages and 120 days elapse from the date of the signing of the present agreement, Party B will be obliged to pay the full consideration, namely $200,000.00, and the closing and the transfer of deed will be done together with the payments.

7. As an integral part of the transaction, it is agreed by the Parties in connection with the fire that took place on Lot A and the bank collected money from the insurance company etc., etc., that the monies already received from the bank will not be subject to any claim or demand or suit by Party B, and regarding any money that is still to be claimed from the insurance company, this will belong to Party A alone, whenever this happens.

8. As an integral part of the transaction, it is agreed in connection with the fire that took place on Lot B that all the monies that it is possible to claim and collect from the insurance company will belong exclusively to Party B. Moreover, the Parties have agreed as an integral part of the transaction relating to the second mortgage on the present lot that if Rabbi Akiva Weiss pays part of this mortgage out of his pocket, that sum will be deducted from the debit account with the bank, which Party B incurred when the Lot was purchased.

9. "Party B" includes Rabbi Zalman Ashkenazi personally and "Party A" includes Rabbi Nahum and his wife, and the signature of one of them will bind the other personally with each of them serving as guarantor for the other.

Declarations

As regards the validity of the present Deed, it is agreed that: a) because the Agreement is founded on the laws of the Torah[3] as distinguished from the law of the City of New York, if there is a discrepancy, Halakha[4] will prevail; b) The Parties have agreed to any method that confirms the particulars/conditions/clauses in the Deed according to the *Yichidi* system; c) Headings and tables of contents in whole or in part are intended only for the convenience of the reader and must not be used by those interpreting their meaning to increase or reduce the scope of the Agreement; d) The present Agreement annuls any prior agreement or decision, whether in writing or verbal.

Our signatures below confirm and bear witness that each and every item contained in the nine clauses of this document extending over two pages has been accepted by us as final, and they are interrelated, and commit all the property we have and whatever we buy in the future, as an absolute obligation and as prevailing over any other obligation and nothing that is valid may be annulled in favor of something else that is invalid and we are very grateful for all the above that has been done by this important Tribunal and we have signed of our own free will, with a full understanding of everything in it and the implications of it and in anticipation of possible changes in the future, and in witness whereof, we have appended our signatures.

Party A_____[signature]_____   Party B_____[signature]_____
                    [signature]                                                [signature]

---

[3] **Translator's Note:** The term "Torah" (meaning "teaching" or "instruction", sometimes translated as "law"), refers either to the Five Books of Moses (or Pentateuch) or to the entirety of Judaism's founding legal and ethical religious texts.

[4] **Translator's Note: Halakha** is the collective body of Jewish religious law, including biblical law and later talmudic and rabbinic law, as well as customs and traditions.



# Global Linguistic Services

### CERTIFICATION PAGE

January 12, 2010

Global Linguistic Services, Inc. certifies that the attached document, Aber, is a true and accurate translation, from Hebrew into English, of the document(s) provided from Abraham, Lerner & Arnold, LLP. All participants in the above-referenced translation are professional translators, editors, and proof readers for Global Linguistic Services, Inc., with an office located at 120 Broadway, Suite 1111, New York, N.Y. 10271.

_____            ___1/12/10_____
Michelle Noviello                                               Date

STATE OF NEW YORK            )
                                                          ss.:
COUNTY OF NEW YORK        )

Sworn to before me this day of January 12, 2010

_____
Notary Public

Lloyd R. Savel
Notary Public, State of New York
No. 01SA6033545
Qualified in New York County
Commission Expires September 19, 2010
Certificate Filed in Queens County

120 Broadway, Suite 1111, New York, NY 10271 • 212 349-2993 • 888 796-2200 • Fax 212 349-4665 • www.glsnyc.com